### HARTWIG REALTY CO v CLEVELAND (city) et

Ohio Appeals 8th Dist, Cuyahoga Co

No 13849. Decided March 5, 1934

Stanley L. Orr, Cleveland, and Harold H. Gorman, Cleveland, for plaintiff.

Ezra Shapiro, Director of Law, Cleveland, and Gordon Locke, Assistant Director of Law, Cleveland, for defendants.

## OPINION

By McGILL, J.

This cause comes before this court on appeal. On or about September 19, 1932, plaintiff, The Hartwig Realty Company, as a taxpayer of the City of Cleveland, filed a petition in the Common Pleas Court against the City of Cleveland, its Mayor and Director of Public Utilities, seeking to enjoin them from applying water rents of the city to the maintenance and operation of the sewage disposal plants of the city of Cleveland, and to have refunded to the Division of Water all funds already applied to that purpose. This alleged diversion, plaintiff claims, is prohibited by the provisions of §3959 GC and §§41 and 113 of the Charter of the City of Cleveland, and constitutes a misapplication of funds. The petition contains additional allegations concerning demand upon the Director of Law, his refusal to institute proceedings and the effect of the continued diversion upon the bonded debt limitations, and credit of the city.

The defendants admit that plaintiff is a taxpayer, that demands to file suit were made and refused and that the city has been applying water rents to sewage disposal purposes. Their principal defenses are in substance:

1. Sec 3959 GC is unconstitutional and does not apply to the City of Cleveland because of the Home Rule provision of **Article XVIII of the Constitution of Ohio.**

2. Sewage treatment in the City of Cleveland is in reality a part of the process of water purification and the expenditures, therefore, do not constitute a misapplication of funds.

3. The matter is res adjudicata, having been decided in the case of Akuszewski v City of Cleveland, being case No. 8082 in this court.

In its reply, the plaintiff alleges that the matter is not res adjudicata, because (a) the Akuszewski case was not tried on its merits; (b), a complete change in the science of water treatment since the decision of the Akuszewski case makes any ruling in that case not applicable.

The greater part of the testimony and exhibits in the instant case relate to the history of the water supply for the city of Cleveland, and deal with the question of whether or not sewage treatment is a part of the process of water purification.

The record discloses that as early as 1874 a tunnel was constructed out into the lake for a mile and a quarter. At various times thereafter difficulty arose by reason of pollution, and at various times new tunnels and intakes were constructed. In 1896 the city again decided to move the intake further out into the lake and as a result the Kirtland tunnel was not completed until 1904.

At the east end tunnel, known as the Kirtland tunnel, the water is taken from the crib about four miles from shore and the west side tunnels are still farther out in the lake.

In 1903 there was a severe epidemic of typhoid fever and again in 1904. Even at that time there was a division of opinion among the experts as to how pure water could be best obtained. Extensive investigations were made in 1911 and 1912, and in 1914 an expert by the name of Pratt recommended the treatment of sewage. His recommendation is based primarily upon the necessity of making shore waters safe for bathing purposes. He felt however, that the purification or treatment of sewage would be an advantage in safeguarding the water supply. In 1915 the State Board of Health directed the City of Cleveland to cease the pollution of the lake by February 13, 1918. The sewage treatment plant was built at West 58th Street about 1916. The three sewage disposal plants during these years were constructed, until in 1928 when the Willow Station was completed. In 1922 the City of Cleveland began using funds of the water works to pay the operating expenses of the sewage disposal plants and shortly thereafter an ordinance was passed by the city council which was embodied in the municipal code of the city of Cleveland and which reads as follows:

"Section 130: The Commissioner of water and heat shall have the charge and management of all plants owned and operated by the city of Cleveland for the furnishing of water for the use of its inhabitants or for the use of others to whom water may be sold. The operation of sewage disposal plants shall be treated and construed as being part of the operation of water purification."

Counsel for plaintiff has sought to establish that there is no connection between the treatment of sewage and the purification of water. Counsel virtually admit that over a long period of years there has been a difference of opinion among experts as to the relationship between the treatment of sewage and the obtaining of a supply of pure drinking water. Counsel for plaintiff, in the record, concede that as late as 1927, when the Akuszewski case was disposed of, "there may have been some justification for holding that sewage disposal had something to do with water purification." But counsel for plaintiff now insist that a new process of purifying water, known as the Chloramine Process, was put into effect in Cleveland in 1931 and that since that time there is no connection whatever between the treatment of sewage and the process of water purification. In other words, counsel for plaintiff claim that no matter how much sewage is put into the lake or how much pollution there is in the water, that the new process is an absolute guarantee of pure water and complete insurance against epidemics of typhoid or other diseases.

With a view to establishing the fact that there is no connection between the treatment of sewage and the water purification, the testimony of two experts for plaintiff is contained in the record. The first was William A. Wallace, Superintendent of the Filtration plant in Detroit, Michigan, and an expert whose qualifications were admitted. His testimony developed the fact that eighty percent of the sewage at Detroit is diverted from the water intakes by means of dykes.

In the course of his cross-examination this question was asked:

"Q. And it certainly is true, isn't it, Mr. Wallace, that there can be such a thing as an overload of bacteria per treatment in a filtration and water treatment plant, no matter what system you are using today? A. Yes."

The record also contains the testimony of George B. Sowers, who was Assistant Chief Engineer in the Division of Engineering and Construction in the City of Cleveland from 1918 to 1931 and in 1932 and 1933 was Commissioner and Chief Engineer. His testimony shows a marked familiarity with the water works department of the City of Cleveand and tends to support the theory of the plaintiff.

In his testimony Sowers repeatedly refers to the work of J. W. Ellms who is in charge of the water purification of the City of Cleveland.

Upon re-cross examination of Mr. Sowers he testified:

"Q. As a matter of fact, to Mr. Ellms more than any other man is due all the wonderful things which you claim?

A. Yes, sir, we hand him all the credit. Mr. Ellms and his staff have done wonderful work and they are given credit not only in Cleveland but all over the country. Hardly a writer doesn't refer to Ellms and Braidech in Cleveland.

Q. He is the pioneer and practically the inventor of the Chloramine Process?

A. I don't know whether he claims to have invented it, but he gave it practical application."

Turning now to the testimony of Joseph W. Ellms who was a witness for the city, we find that according to his testimony the Chloramine Process has no advantage as to destroying bacteria over the treatment of water by chlorine alone, which was used prior to 1931, and that for the purpose of killing germs or destroying bacteria the chlorine is relied upon.

In the course of Ellms testimony appears the following:

"Q. Is there any definite proof whatsoever that the chloramine process will take care of any B. Coli content, or the bacteria content more than the pure chlorine treatment would?

A. Not that I know of."

Again Ellms testified:

"Q. Would you say then, Mr. Ellms, that it could be safely said that there is any difference in the matter of having to guard against an overload since the adoption of the so-called chloramine process as compared to the time you used chlorine alone?

A. No."
* * *

"Q. Have you ever read a report to the effect that under our present treatment of water in existing plants the matter of pollution of the source of supply could safely be ignored?

A. I don't recollect such a thing. It doesn't seem in agreement with common sense."
* * *

"Q. And in fact, is it or is it not true, Mr. Ellms, that everywhere this water problem has been considered, the experts have all recommended every possible protection of the water supply in addition to treatment of the water after it is supplied?

A. Yes."

While the testimony of Wallace and Sowers tended to establish the contention of the plaintiff, it cannot be said to meet the testimony of such a recognized expert as Mr. Ellms whose opinion is clearly indicated by the excerpts of his testimony above set forth.

The City of Cleveland functions under a charter in pursuance of **Article XVIII of the Constitution of Ohio,** known as the Home Rule Amendment.

The Charter of the City of Cleveland, pursuant to the constitutional authority, provides among other things that, (a) it may own and operate public utilities; (b) it may appropriate the money of the city for all lawful purposes; (c) it may create, provide for and maintain all things of the nature of public works and improvements; (d) it may pass such ordinances as may be expedient for maintaining and promoting the welfare of the city and for the performance of the functions thereof. It also provides that the city shall have all the powers granted by the Constitution or laws of Ohio, and shall exercise such powers in the manner prescribed by the charter, or in such manner as shall be provided by ordinance of the council.

Section 79 of the charter provides that the work of the several departments shall be distributed among the divisions thereof as established by the charter or by the council.

Pursuant to the authority derived from the Constitution the city of Cleveland owned and operated a system of waterworks and in pursuance of this authority §130 of the Municipal Code was passed.

It is contended by plaintiff, however, that §3959 GC operates as a restriction and prohibition upon such otherwise authorized use of such funds. §3959 GC reads as follows:

"After paying the expenses of conducting and managing the water works, any surplus therefrom may be applied to the repairs, enlargement or extension of the works of the reservoirs, the payments of the interest of any loan made for their construction or for the creation of a sinking fund for the liquidation of the debt. The amount authorized to be levied and assessed for water works purposes shall be applied by the council to the creation of the sinking fund for the payment of the indebtedness incurred for the construction and extension of water works and for no other purposes whatever."

Plaintiff claims that §130 of the ordinance and that the alleged diversion of funds from the water rents to the treatment of sewage, are in violation of this section, §3959 GC, and reliance is placed upon the case of **Cincinnati v Roettinger, 105 Oh St**

145 (1922). In that case a taxpayer of Cincinnati enjoined the alleged misapplication of funds derived from the operation of the water works, toward the payment of fixed charges and current expenses of the city. §3959 GC, was considered by the Supreme Court. It is to be noted that in that case the city charter expressly adopted and continued in force the general and special laws enacted by the General Assembly. In addition the water rents were there attempted to be transferred to the general fund.

We think that this case is distinguishable from the case at bar and particularly where it is shown that there is a definite relationship between the treatment of sewage and the process of water purification.

In addition, §3959 GC, does not apply provided the treatment of sewage is intimately connected with and is in fact a part of the process of water purification, as we think it is under the evidence in this case. §§41 and 113 of the Charter do not prohibit the use of water rents for the treatment of sewage.

For many years, as disclosed by the record, the city has followed a well defined policy of treating sewage, not only to make bathing safe but also in order to assure a supply of pure water.

In the instant case we think the evidence shows a real and substantial connection between the sewage treatment and water purification. Certainly it is an administrative and not a judicial question as to what policy should be pursued with reference to preventing the pollution of the water before the purification process at the filtration plant is invoked.

In McQuillan Municipal Corporations, Vol. 1, page 963, it is said:

"Assuming that the municipal authorities have acted within the orbit of their lawful authority, no principle of law is better established than that courts will not sit in review of proceedings of municipal officers and departments, especially those involving legislative discretions, in the absence of bad faith, arbitrary action or abuse of power."

In the case of **Butler v Karb, Mayor, 96 Oh St 472**, it is said by Matthias, J, at page 481:

"The rule to be applied in actions such as this has been stated frequently, but probably nowhere better than in the opinion of the court in the case of Dailey v New Haven, 60 Conn. 314, 319, where it is said: 'With the exercise of discretionary powers, courts rarely and only for grave reasons, interfere. These grave reasons are found only where fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power, or violation of law, enter into and characterize the result. Difference in opinion or judgment is never a sufficient ground for interference.'"

In view of the long established policy in the city of Cleveland and the ordinance enacted in pursuance thereof, we feel that under the facts and testimony disclosed in this record it is a question of policy for the administrative officials and that a court of equity should not interfere. A court of equity is here called upon to substitute its judgment for that of the administrative officials.

Granting, for the sake of argument, that the chloramine process of water purification is an advanced and improved method, nevertheless the city adopted a policy with reference to the treatment of sewage which was reasonable, and was supported by the belief of experts. If any change is made in the methods, that change should be made by the administrative officials of the city government who are charged with the responsibility of keeping our water supply pure. No court of equity is empowered to direct a change of policy. Not only is the court called upon to substitute its judgment, for that of the administrative officials, but the experts do not agree. In view of the testimony of the recognized expert, Mr. Ellms, that there is danger of an overload of bacteria, it would be wrong and a usurpation of power for this court to enjoin the use of funds which we believe the record establishes do relate to water purification and a prevention of epidemics and disease.

There is an additional reason why this injunction should be denied. In their argument and brief, counsel for defendant urged that a hearing in the Akuszewski case had rendered the question res adjudicata.

The bill of exceptions discloses that the defense of res adjudicata was urged, together with other grounds, at the close of plaintiff's testimony, and the motion was renewed at the close of all the testimony, and an exception noted to the court's refusal. In connection with the testimony offered by the defense, the defendant offered in evidence the pleadings and papers in the Akuszewski case as an exhibit.

The journal entry in the Akuszewski case, being case No. 8082 in this Court of Appeals, reads as follows:

"This cause came on to be heard upon the pleadings, and the transcript of the record and testimony in the Court of Common Pleas; and the court being of the opinion that the equity of the case is with the appellees and that substantial justice has been done the appellant, the judgment of the Court of Common Pleas is affirmed, there being, however, in the opinion of the court reasonable grounds for this appeal. It is therefore considered that said appellees recover of said appellant their costs herein. Ordered that a special mandate be sent to the Court of Common Pleas to carry this judgment into execution. The appellant excepts."

While it is urged in the brief of plaintiff that the Akuszewski case was never tried upon its merits, the bill of exceptions in the instant case does not sustain this contention.

Furthermore, an examination of the pleadings, transcript and journal entry in the Akuszewski case, does not disclose any irregularity, fraud or collusion.

It is fundamental that the court speaks through its journal. The journal entry in the former case recites a hearing upon the pleadings, the transcript and the testimony. It is well settled that a judgment rendered in a court having jurisdiction of the parties and the subject matter is binding until set aside or vacated by proper procedure. The general rule is well set forth in the case of **Moore v Robinson, 6 Oh St 303**, in syllabus 3, which reads as follows:

"A judgment rendered by a court having jurisdiction of the subject matter and the person, cannot be treated as a nullity. It binds the parties until vacated by appeal or reversed upon error, by a court having appellate jurisdiction, and cannot be collaterally attacked."

Again, in the case of **State ex v LeBlond, 108 Oh St 126** it is said:
"Where the court has jurisdiction of the parties and the subject matter and its judgment is not null and void by reason of being beyond the power and authority of the court to enter, such judgment is not open to collateral attack in an independent proceeding."

It is significant to note that no motion or petition has been filed to vacate the judgment in case No. 8082 nor has evidence been offered in the instant case which will support the contention that it was not a trial on the merits.

It is true that the action is not between the identical parties. The former action did involve the same subject matter and was brought by Akuszewski as a taxpayer for the benefit of the city. In the brief filed in Common Pleas Court in that case, the Roettinger case in 105 Ohio State Reports, was cited. This former judgment covering the same subject matter, and the action having been brought by a taxpayer for the benefit of the city, brings this case within the rule not only as to the issues actually raised and decided but also as to every matter which might properly have been presented.

In the case of Floersheim v Harding County, 28 N. M. 330; 212 Pac. Rep. 451, it is said:

"2. Where suit is brought to determine a public right, involving a matter of general interest by one qualified citizen in behalf of himself and all others similarly situated, all such other citizens are parties to the proceeding by representation, and we are bound by the judgment, not only as to matters which were litigated, but also as to matters which existed at the time and could have been litigated in the case, the same as the actual formal parties on the record, regardless of whether they had actual notice of the pendency of the suit or not."

See 20 A.L.R. 1133.
64 A.L.R. 1262.
In the case of **Quinn et v State ex LeRoy, 118 Oh St 48** (1928) syllabus 1 contains the following:

"Material facts or questions which were in issue in a former suit, and were there judicially determined by a court of competent jurisdiction, are conclusively settled by the judgment therein so far as concerns the parties to that action and persons in privity with them and cannot be again litigated in any future action between the same parties or privies and this rule also applies not only to what was determined but also as to every other question which might properly have been litigated in the case."

Accordingly, a recovery is prevented in the instant case on this ground unless there has been a change in conditions since 1929, when the journal entry was signed in the Court of Appeals, which changed condition makes the former ruling inapplicable.

It has already been pointed out, particu-

larly in the testimony of Mr. Ellms, that the chloramine process is not a guarantee against the dangers from polluted drinking water, or from an overload of bacteria. It is perfectly clear from Mr. Ellms' testimony that he still relies upon chlorine to kill bacteria, as was done for several years prior to the practical application of the chloramine process.

Such a change in the science of water treatment has not been shown so as to make the Akuszewski decision inapplicable.

By way of summary, we think that under the Constitution the city of Cleveland adopted a charter which gave the city broad powers of local self-government; that in pursuance of these powers, §130 of the Municipal Code properly places the treatment of sewage as part of the operation of water purification; that §2959, GC, and the Roettinger case in 105 Oh St do not apply under the facts in this case; that the record discloses a relationship between the treatment of sewage and the obtaining of pure drinking water; that there is involved an administrative question or policy which ought not to be interfered with and that a court of equity should not, under the facts disclosed in this record, grant an injunction and thereby substitute its judgment for that of the administrative officials; and finally, that the questions involved here were adjudicated in the Akuszewski case and that the record does not disclose any such change in circumstances as to make that former decision inapplicable.

LEVINE, J, concurs in judgment.
LIEGHLEY, PJ, dissents.

## DISSENTING OPINION

By LIEGHLEY, PJ.

Any surplus, after paying expense of operation of water works, may be applied to repairs, enlargement and extensions of works and reservoirs. Revenues from any and all sources are limited to costs of construction, maintenance and extensions and may not be used for any other purpose. §3959, GC. The funds shall be segregated for such purposes only. §3960 GC.

"Syl. 1. Sec 3959, GC, is constitutional and operates as a valid limitation upon the uses and purposes for which revenues derived from municipally owned waterworks may be applied. By virtue of the provisions of that section, surplus revenues derived from water rents may be applied only to repairs, enlargement or extension of the works, or of the reservoirs, and to the payment of the interest of any loan made for their construction, or for the creation of a sinking fund for the liquidation of the debt."

Cincinnati v Roettinger, 105 Oh St 145.

Section 113 of the Cleveland City Charter requires strict accounting and like segregation of income of each utility owned and operated by the City. This section and other related sections clearly recognize the limitations and restrictions imposed by §§3959 and 3960 GC.

In 1924, after the adoption of the Charter, the City Council as part of the Municipal Code enacted §130 which reads as follows:

Sec. 130: "The commissioner of water and heat shall have the charge and management of all plants owned and operated by the City of Cleveland for the furnishing of water for the use of its inhabitants or for the use of others to whom water may be sold. **The operation of sewage disposal plants shall be treated and construed as being part of the operation of water purification.**"

Thereafter, there was diverted from the funds of the water works more than one hundred thousand dollars per annum to defray the expense of operaton of sewage disposal plants.

The last sentence of this section is unauthorized, unwarranted, in conflict with and in excess of the grant of power conferred by §3959 GC, and out of harmony and in conflict with §§41 and 113 of the Charter itself.

It was claimed that §3959 GC, had no application for the reason that Cleveland is a Home-Rule City. However, §130 of the Municipal Code contravenes §41 of the Charter, which forbids 'transfer of revenues or earnings of any non-tax supported public utility to any other purpose.' Also, state law supersedes the Charter whenever the City in its operations imposes discriminatory, unequal or unjust burdens of taxation.

But, it is now contended there was in fact no transfer of funds because the City Council in its wisdom in 1924 said sewage disposal is part of water purification. It is said this finding of the Council establishes this fact. The trial of this case was largely devoted to this issue of fact. It is my judgment that this case does not turn on this issue of fact nor is it in any sense controlling.

Everybody knows, and knew when this statute and Charter were adopted, that dumping sewage in the lake contaminates the water. And, if reduced before dumping it, no pollution would result thereby or therefrom. Then and now all knew that lake water for domestic use required certain processes of purification. It is presumed all legislation was enacted in the light of this general knowledge. The proof in this case establishes the incontrovertable fact that these processes and treatments of the water are indispensably necessary with or without sewage disposal plants. Rivers, creeks, surface waters and storm water sewers carry tons upon tons of animal droppings, organic matter, dirt and filth into the lake. Sewage disposal affects the necessity of sanitation, along the lake as much as essential water purification. The water department is amply able to cope with its problems as shown by the proof without taking over any auxiliary activities at the source of contamination. No other city on the lake has resorted to this subterfuge.

This §130 of the Municipal Code was inspired and adopted in 1924 for the obvious purpose of relieving the general fund, budgetized from moneys derived from general taxes, of the cost of operation of these sewage disposal plants and loading this cost on the shoulders of water users. If this was not the purpose, then no rational theory exists to explain the action. The result is a larger sum in the general fund for promiscuous uses and indiscriminate tax spending, and water users are indirectly taxed for activities that the general tax duplicate should sustain.

The personnel of the list of water users differs from the list of general taxpayers in all municipalities, to a greater or less degree. If a council, by simply passing an ordinance declaring that sewage disposal is part of water purification, may legalize this species of indirect taxation in defiance of general and well recognized rules of taxation, then we have a departure involving possible additional transfer and the establishment of a rule of uncertain consequences throughout the State.

It is only a short step to take for the Council to say that scientific control and operation of the sanitary sewer system,—the conduits that carry the sewage to the disposal plants,—are part of water purification, and thereby compel water users to bear this burden of maintenance and thereby effect a transfer of funds by indirection.

The Council might solemnly declare it to be a fact that the scientific harnessing of storm water sewers at well chosen intersections, and the interception and treatment of disease-germ carrying organic matter would diminish lake contamination and be a part of water purification. If made an issue of fact in a trial, doubtless oral testimony would confirm this finding of fact. Then water users should maintain this system and not general taxes or sewer taxes levied for the specific purpose.

Finally, the decree should be for plaintiff.

Sec. 130 of the Municipal Code is unauthorized. It is in conflict with and contrary to law. It is an unlawful indirect levy of taxes for the benefit of the general fund of the City. Conceding it to be a fact that sewage disposal plants reduce the amount of lake water contamination, that fact does not make sewage disposal a proper water department responsibility, nor justify an indirect transfer of funds in face of express statute and charter provision to the contrary. This fact will not authorize the commission of an act indirectly that can not be legally done directly. Nor can §3959 GC and §41 of the Charter be amended by mere declaration of Council.